# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. | C-250470 |
| | | | C-250471 |
| Plaintiff-Appellee, | : | TRIAL NOS. | C/23/CRB/18200 |
| | | | 24/CRB/3435 |
| vs. | : | | |
| DARRELL QUARLES, | : | | |
| Defendant-Appellant. | : | *JUDGMENT ENTRY* | |

This cause was heard upon the appeals, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgments of the trial court are affirmed.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 6/24/2026 per order of the court.**

**By:**_____
        **Administrative Judge**

[Cite as *State v. Quarels*, 2026-Ohio-2394.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. | C-250470 |
| | | | C-250471 |
| Plaintiff-Appellee, | : | TRIAL NOS. | C/23/CRB/18200 |
| | | | 24/CRB/3435 |
| vs. | : | | |
| DARRELL QUARLES, | : | | |
| Defendant-Appellant. | : | *O P I N I O N* | |


Criminal Appeals From: Hamilton County Municipal Court

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: June 24, 2026


*Emily Smart Woerner*, City Solicitor, and *Susan M. Zurface*, Chief Prosecuting Attorney, for Plaintiff-Appellee,

*Roger W. Kirk*, for Defendant-Appellant.

**KINSLEY, Presiding Judge.**

{¶1}    Defendant-appellant Darrell Quarles was convicted by the Hamilton County Municipal Court of two counts of engaging in the business of security services without a license.  He challenges his convictions on appeal, arguing that the trial court's judgments were against the manifest weight of the evidence and that the State failed to present sufficient evidence of the offenses at trial.  Quarles also argues that R.C. 4749.13—the statute which requires individuals who engage in the business of security services to be specially licensed—unconstitutionally infringes on his due process and equal protection rights.  We disagree on all fronts.  As explained in this opinion, we reject Quarles's constitutional and evidentiary arguments and affirm the judgments of the trial court.

## *Background*

{¶2}    Following an investigation by the Ohio Department of Homeland Security ("Homeland Security department") and the Cincinnati Police Department ("CPD"), Quarles was charged in two separate cases with engaging in the business of security services without a license, first-degree misdemeanors.  *See* R.C. 4749.13(A) and 4749.99(A).  The charge in the case numbered C/23/CRB/18200 was alleged to have occurred at Clutch OTR bar on October 19, 2023.[1]  The charge in the case numbered 24/CRB/3435 was alleged to have occurred at the Aura Room bar on February 29, 2024.[2]

{¶3}    Quarles filed motions to dismiss the charges in both cases, asserting that R.C. 4749.13 is unconstitutional on its face and as applied to him.  In particular,

---

[1] Quarles appealed his conviction in the case numbered C/23/CRB/18200 in the appeal numbered C-250470.

[2] Quarles appealed his conviction in the case numbered 24/CRB/3435 in the appeal numbered C-250471.

Quarles alleged that the statute classified employees and business owners who provide security services into different categories and then treated them differently without a rational basis for doing so. In his written motions, Quarles also alleged that R.C. 4749.13 is unconstitutionally arbitrary, capricious, and overbroad, although he offered little explanation for what he meant by these terms.

{¶4} The trial court conducted an evidentiary hearing on Quarles's motions to dismiss, at which Quarles called four witnesses to testify. The first witness was Investigator Nick Gescheider, an enforcement investigator with Ohio's Homeland Security department. Gescheider began his testimony by addressing the purpose and mechanics of the security services licensing requirement. To that end, Gescheider testified that individuals who provide security services are required by law to have a "guard card," which he described as a special license issued by the Homeland Security department. Gescheider indicated that "bouncers" and other staff who verify the identification of guests outside of bars and nightclubs provide security services and therefore fall within the "guard card" requirement. However, according to Gescheider, the "guard card" law contains an exception. Where a business employs a person to provide security services for the company, and the employee receives a W2 tax form from the employer, the employee is not required to obtain a "guard card." In other words, as Gescheider explained, individuals working as corporate security are exempt from the licensing requirement, but those who perform contract security services are not.

{¶5} Gescheider further testified that the purpose of the security services licensing requirement is to protect public safety. In particular, requiring licenses of security personnel ensures that security guards are distinguishable from police officers and are adept at managing public danger. He also explained that those interests may

not apply with the same force against private employers, who have incentives to set their own standards for their employees who provide security.

**{¶6}** After addressing the licensing requirement, Gescheider explained his investigation of Quarles's conduct. Gescheider first came into contact with Quarles when police responded to a shooting at a bar called Brandy's Lounge. The police suspected that the bar's security guards were unlicensed and were not employed by Brandy's, so they alerted Gescheider.[3] Gescheider then searched Quarles's name in a state database and found no record for him. But Gescheider spoke with Quarles, who admitted that he operated his own private security company. Later, Gescheider was again alerted by CPD that Quarles was serving as an unlicensed security guard, this time at an establishment called Aura.

**{¶7}** Quarles's next witness was CPD Officer Dennis Barnette. Barnette testified that he arrived on scene at Brandy's in response to a shooting, where he recognized Quarles. At the time, Quarles was dressed in tactical gear and a vest that said "fugitive response team" on the front. Barnette did not request a "guard card" from Quarles at the time.

**{¶8}** Quarles next called CPD Officer Doug Horton. Horton identified Quarles at the front of the Clutch bar, where he was working security.

**{¶9}** Quarles's final witness in support of his motions to dismiss was CPD Officer Brent Eve. Eve testified that he was aware of Quarles from his time policing various bars in the central business district, including a time when he responded to a fire alarm at Aura Room. Eve also testified that he had been instructed by the vice

---

[3] Quarles was charged with a third count of engaging in the business of security services without a license arising from the incident at Brandy's Lounge, but the trial court found him not guilty of this offense.

squad to request "guard cards" from security guards.

**{¶10}** The trial court denied Quarles's motions to dismiss and continued the cases for trial.

**{¶11}** On October 3, 2024, Quarles tried the two charges against him to the bench. The State presented four witnesses: (1) Eve, (2) Barnette, (3) CPD Officer Curtis Latham, and (4) Gescheider.

**{¶12}** Eve testified to events that occurred when he responded to a fire alarm at Aura Room. When Eve arrived on the scene, Quarles stood at the door of the bar. Quarles wore a bullet-proof vest and other attire that resembled a security guard. Quarles also had a firearm. According to Eve, the bar was in operation, as he could see people inside the building who were smoking and mingling.

**{¶13}** Eve was wearing a body-worn camera ("BWC") at the time, and its footage was admitted into evidence and played for the trial court. Eve's BWC footage depicted Eve asking Quarles for his "guard card." Quarles responded that he left his wallet at home.

**{¶14}** Barnette testified he observed Quarles in the parking lot of Brandy's Lounge when he arrived at the bar in response to a reported shooting. Quarles was dressed in a tactical vest that said "Lieutenant Quarles." Quarles told Barnette that he was not working that evening.

**{¶15}** Latham responded to the Clutch bar on September 30, 2023 in response to a report from undercover officers who had been conducting an operation at the establishment related to underage drinking. When Latham arrived, he encountered Quarles, who was wearing a vest that said "security." Quarles also carried a firearm. Quarles declined to provide his social security number or license information to Latham.

**{¶16}** Like Eve, Latham wore a BWC, and his BWC footage was admitted into evidence. Latham's BWC footage showed Quarles managing a parking problem in Clutch's parking lot.

**{¶17}** Gescheider testified that he interviewed Quarles at his home following the incident at Brandy's Lounge. The interview was recorded, and the recording was played in court. During the interview, Quarles denied working as a security guard the night of the shooting at Brandy's. But he acknowledged that he owns a private security company called P&Q Security and Fugitive Recovery ("P&Q"), that he is aware of the "guard card" requirement, and that P&Q is unlicensed. Quarles also told Gescheider that he does not maintain contracts with the businesses that he works for but normally gets paid $40 to $50 in cash.

**{¶18}** After interviewing Quarles, Gescheider searched for Quarles in a state database for licensed security services. He was unable to find Quarles.

**{¶19}** The trial court found Quarles guilty of the offenses arising from Clutch and Aura Room. Quarles moved the trial court to reconsider its verdicts, arguing that the State had not disproven that Quarles was an employee of either Clutch or Aura Room and was therefore exempt from the licensing requirement. The trial court denied the motion. In both cases, it sentenced Quarles to 180 days in jail, 179 of which were suspended. He was given credit for one day and placed on one year of community control. The trial court remitted Quarles's fines and court costs and stayed Quarles's sentences pending appeal.

### *Analysis*

**{¶20}** Quarles raises three assignments of error on appeal. The first relates to the trial court's denial of his motions to dismiss. The second and third challenge the weight and sufficiency of the evidence presented at trial. None of Quarles's

assignments of error have merit.

## *Constitutional Challenges*

{¶21}  In his first assignment of error, Quarles contends that the trial court erred as a matter of law by denying his motions to dismiss, because R.C. 4749.13 violates his equal protection and due process rights.

{¶22}  As an initial matter, our review of Quarles's argument is frustrated by the lack of completeness in his briefing.  Quarles's constitutional challenge comprises a mere four paragraphs in his appellate brief, in which he fails to cite a single authority.  As Quarles has barely developed a constitutional argument, we could overrule his assignment of error on this basis alone.  *See, e.g., Hall v. Waselski*, 2025-Ohio-2552, ¶ 19 (9th Dist.) ("where the appellant failed to develop an argument . . . this court may disregard those assignments of error").  But, for the sake of completeness, we address Quarles's claims as best we understand them.  In doing so, we apply a de novo standard of review.  *See State v. Hammock*, 2022-Ohio-3570, ¶ 10 (1st Dist.) (holding that the constitutionality of a statute is a legal question subject to de novo review on appeal).

{¶23}  Quarles's first allegation is that R.C. 4749.13 deprives him of equal protection by treating private security guards differently from the employees of businesses who provide security services for their employers.  "Equal protection does not forbid the legislature from making classifications but simply prohibits 'treating differently persons who are in all relevant respects alike.'"  *State v. Duncan*, 2025-Ohio-1153, ¶ 30 (1st Dist.), citing *State v. Klembus*, 2016-Ohio-1092, ¶ 8.  Thus, where a statute classifies individuals on the basis of a nonsuspect classification, the law will be upheld if it bears a rational relationship to a legitimate government interest.  *Id.* at ¶ 34.  Under this rational basis standard, the government has no obligation to produce evidence supporting either its interest or the relationship between its interest and the

challenged law. *Pickaway Cty. Skilled Gaming, L.L.C. v. Cordray*, 2010-Ohio-4908, ¶ 19. Rather, "[t]he party challenging the constitutionality of a statute bears the burden to negate every conceivable basis that might support the legislation." (Cleaned up.) *Id.*

**{¶24}** Ohio's security services licensing statutes create two groups—those that require a license and those that do not. The dividing line between the groups is employment status. Pursuant to R.C. 4749.01(H)(6), an employee of a business who secures the employer's property and is subjected to tax withholding by the employer is exempt from the R.C. 4749.13 licensing requirement Quarles was convicted of violating. Because this is a nonsuspect classification, the statutory scheme need only be rationally related to a legitimate government interest.[4] And Quarles bears the burden of showing it is not in order to prevail.

**{¶25}** Quarles has made no such showing. To the contrary, at the evidentiary hearing on Quarles's motions to dismiss, Gescheider testified that the security services licensing requirement is supported by the state's interest in promoting public safety. He explained that licenses are needed to ensure that security guards are not confused with police officers and to promote security guards' ability to manage public danger. These interests are plainly legitimate. *See, e.g., State v. Green*, 2013-Ohio-1197, ¶ 9.

**{¶26}** As to whether the licensing scheme is rationally related to public safety, Gescheider testified that the government's concern about security guard preparedness is less strong with respect to private employers, who have reasons to develop their own safety standards for their employees. This explains why the license requirement

---

[4] A suspect classification involves race, national origin, or a fundamental right, categories that are plainly not at issue here. *See Adamsky v. Buckeye Local School Dist.*, 73 Ohio St.3d 360, 362 (1995).

applies only to those who work for or supply external security services. Quarles presented no evidence to undercut this assertion. He therefore failed to carry his burden under the rational basis test, and we reject his equal protection challenge to R.C. 4749.13.

{¶27} In addition, Quarles contends that he has a due process right to pursue his chosen profession, which is compromised by the State's security services licensing requirement. We disagree. As the Ohio Supreme Court has held, "[T]he state may set standards and regulate professions with the aim of protecting the public . . . ." (Cleaned up.) *In re Jones*, 2018-Ohio-4182, ¶ 40. That is exactly what the State did here.

{¶28} Finally, in passing, Quarles suggests that R.C. 4749.13 is unconstitutionally vague. However, Quarles failed to develop this argument below and has therefore waived it. *See State v. Smith*, 2019-Ohio-5350, ¶ 15 (1st Dist.).

{¶29} For these reasons, we overrule Quarles's first assignment of error.

### *Weight and Sufficiency of the Evidence*

{¶30} In his second and third assignments of error, Quarles argues that his convictions are supported by insufficient evidence and are against the manifest weight of the evidence. We consider these assignments of error together.

{¶31} To determine whether a conviction is supported by sufficient evidence, we inquire "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. *See State v. Curry*, 2020-Ohio-1230, ¶ 11 (1st Dist.).

{¶32} When reviewing whether Quarles's convictions are against the manifest weight of the evidence, we sit as the "thirteenth juror." *State v. Thompkins*, 78 Ohio

St.3d 380, 387 (1997). "A verdict can be against the manifest weight of the evidence even though legally sufficient evidence supports it." *State v. Myers*, 2018-Ohio-1903, ¶ 140. To evaluate a manifest weight challenge, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of all witnesses. *State v. McKelton*, 2016-Ohio-5735, ¶ 328. The panel questions whether the trier of fact clearly lost its way in resolving evidentiary conflicts and rendered a verdict that embodies a manifest miscarriage of justice. *State v. Wilks*, 2018-Ohio-1562, ¶ 52.

**{¶33}** To obtain a conviction for engaging in the business of security services without a license under R.C. 4749.13(A), the State was required to prove that Quarles did not have a security services license and that he "[f]urnish[ed], for hire . . . guards . . . whose primary duties are to protect persons or property." R.C. 4749.01(D)(1) (defining the term "business of security services" as used in R.C. 4749.13(A)). Quarles does not dispute that he was unlicensed. Therefore, the only question is whether Quarles furnished security services for hire at Clutch and Aura Room on the dates in question.

**{¶34}** Ample evidence presented at trial proved that he did. On both occasions, officers observed Quarles outside the bars dressed in clothing that identified him as a security guard. At Clutch, Latham observed Quarles wearing a vest labeled "security." At Aura Room, Eve saw Quarles dressed in a bullet-proof vest and other security-type attire. Quarles had a firearm on his person both times as well. Latham's BWC captured Quarles performing security guard functions in Clutch's parking lot.

**{¶35}** Quarles also made statements that were consistent with his performance as a security guard. For example, when Eve asked for his "guard card,"

he did not deny serving as a security guard. Instead, he said his wallet was at home. Quarles also admitted to Gescheider that he owns a security company, P&Q.

{¶36} As for the "for hire" element of R.C. 4749.01(D)(1), the evidence is also substantial that Quarles performed security services at the bars for a financial benefit. When interviewed by Gescheider, Quarles indicated that he was typically paid $40 or $50 in cash for his services. In Latham's BWC footage, Quarles also admitted that he was "hired" to secure the parking area.

{¶37} Thus, sufficient evidence provided to the trial court supports the trial court's conclusion that Quarles was hired to furnish security services to Clutch and Aura Room without a license. This is not the exceptional case where the trial court's verdicts were against the manifest weight of the evidence.

{¶38} We overrule Quarles's second and third assignments of error.

### *Conclusion*

{¶39} Having overruled Quarles's three assignments of error, we affirm the judgments of the trial court.

Judgments affirmed.

**BOCK** and **NESTOR, JJ.,** concur.